**UNITED STATES of America, Plaintiff,**

v.

**The SHERWIN–WILLIAMS COMPANY, the Glidden Company, and Specialty Coatings Company, Inc., Defendants.**

**No. 00CV2064.**

United States District Court, C.D. Illinois, Danville/Urbana Division.

Jan. 19, 2001.

---

**17.** The Court retains jurisdiction solely for the

purpose of resolving the issue of sanctions.

Craig A. Melodia, U.S. Environmental Protection Agency, Chicago, IL, David H. Hoff, U.S. Atty., Urbana, IL, Matthew A. Fogelson, U.S. Department of Justice Environment and Natural Resources Div., Environmental Enforcement Section, San Francisco, CA, for Plaintiff.

Ralph E. Cascarilla, Phillip C. Kosla, Walter & Haverfield, Cleveland, OH, Andrew H. Perellis, Philip L. Comella, Seyfarth Shaw, Chicago, IL, Jeffrey C. Fort, Sonnenschein Nath & Rosenthal, Chicago, IL, Roger K. Heidenreich, Sarah Wright Rubenstein, Sonnenschein Nath & Rosenthal, St. Louis, MO, for Defendants.

### ORDER

MCCUSKEY, District Judge.

On November 21, 2000, the Magistrate Judge filed a Report and Recommendation in this case (# 37). The Magistrate Judge recommended that Defendants' Motions to Dismiss Count II of Plaintiff's Complaint (# 14, # 15, # 19) be GRANTED. The Magistrate Judge determined that: (1) Defendants' Motions to Dismiss are not barred by the doctrine of collateral estoppel; (2) the United States' claim for recovery of response costs under Count II of its Complaint is barred by collateral estoppel because of the consent decree the United States entered into in the case of *United States of America v. James D. Cross, et al.*, Case No. 89–2306; and (3) the United States' claim for recovery of response costs under Count II of the Complaint is barred by the doctrine of judicial estoppel because of representations made to the court when entering into the consent decree in *United States of America v. James D. Cross, et al.*, Case No. 89–2306.

On December 6, 2000, Plaintiff filed its Objections to the Magistrate Judge's Report and Recommendation Dated November 21, 2000(# 38). In its Objections, the United States first argues that collateral estoppel should be applied against Defendants because the arguments raised by Defendants in the instant case were previously litigated when Defendants intervened in *United States of America v. BASF Corp. and OXY USA,* Case No. 95–2244, to oppose the consent decree entered

in that case. The United States also argues in its Objections that neither collateral estoppel nor judicial estoppel preclude the United States from seeking recovery of response costs from Defendants. In support of this contention, the United States indicates that it never intended to resolve its claims against Defendants in the consent decree entered into in *United States of America v. James D. Cross, et al.*, Case No. 89–2306. Finally, Plaintiff argues that the application of judicial estoppel is inappropriate because it does not believe it took a position in *United States of America v. James D. Cross, et al.*, Case No. 89–2306, inconsistent with its present position. Furthermore, Plaintiff believes the application of judicial estoppel is unwarranted because its current claim is based upon new information on the amount of response costs it has incurred.

Defendants Sherwin–Williams Company, Glidden Company, and Specialty Coatings Company have filed Responses to the United States' Objections to the Magistrate Judge's Report and Recommendation (# 39, # 40, # 42, # 43).

This court has reviewed the Magistrate Judge's reasoning, Plaintiff's Objections, and Defendants' Responses. After a thorough and careful de novo review, this court agrees with and accepts the Report and Recommendation of the Magistrate Judge.

IT IS THEREFORE ORDERED:

(1) Defendants' Motions to Dismiss (# 14, # 15, # 19) are GRANTED.

(2) This case is referred to the Magistrate Judge for further proceedings.

## REPORT AND RECOMMENDATION

BERNTHAL, United States Magistrate Judge.

In February 2000, Plaintiff, the United States of America (hereinafter "Government"), filed a complaint against Defendants, the Sherwin–Williams Company (hereinafter "Sherwin–Williams"), the Glidden Company (hereinafter "Glidden"), and Specialty Coatings Company (hereinafter "Specialty"), alleging violations of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. § 9601 *et seq.*) (hereinafter "CERCLA"). In June 2000, Specialty filed a Motion To Dismiss and Memorandum in Support (# 14), Glidden filed a Motion To Dismiss Count II of the Complaint (# 15), and Sherwin–Williams filed a Motion To Dismiss Certain Claims of Plaintiff's Complaint (# 19). After reviewing the parties' pleadings and memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Defendants' motions to dismiss (# 14, # 15, # 19) be **GRANTED**.

### I. Background

From 1961 to 1980, James and Abner Cross operated a pail and drum reclamation business at the Cross Brothers Site (hereinafter "Site"). As a result of their operations, the soil and groundwater at the Site became heavily contaminated with hazardous substances. In September 1989, the Regional Administrator for EPA Region V, with the concurrence of the State of Illinois, issued a Record of Decision that described a clean-up plan for the Site. In February 1990, the EPA, pursuant to Section 106(a) of CERCLA (42 U.S.C. § 9606(a)), issued an administrative order (hereinafter "UAO") to six entities, including Sherwin–Williams, Glidden, and Specialty, requiring them to perform remedial action at the Site as set forth in the Record of Decision.

### A. *United States v. Cross,* No. 89–2306

In October 1989, the Government filed a cost recovery action in the District Court, pursuant to Section 107 of CERCLA (42 U.S.C. § 9607), seeking (1) recovery of

response costs it had incurred in remediating the Site, and (2) a declaration that the defendants were liable for future costs that the Government might incur in connection with the Site. (*See United States v. Cross,* No. 89–2306, hereinafter *"Cross I."*) The Government named as defendants Sherwin–Williams, Glidden, Specialty, BASF Corporation (hereafter "BASF"), OXY USA (hereinafter "OXY"), James Cross, and Krueger Ringier.

The defendants brought a third-party action against 11 additional parties. The third-party complaint sought contribution from the third-party defendants for their proportionate share of (1) any amounts the defendants were required to pay the Government for response costs, pursuant to CERCLA's contribution provision (42 U.S.C. § 9613), and (2) the costs the defendants themselves would incur in performing the remedy under the UAO.

The Government lodged with the District Court a proposed consent decree under which it agreed to settle the liability of James Cross and the 11 third-party defendants for response costs incurred by the Government in connection with the Site. Under the terms of this settlement, the settlors would pay the Government $2,942,232, an amount equal to approximately 40% of the estimated total cleanup costs for the Site, including past and future response costs incurred by both private parties and the Government. This figure is based on EPA calculations, as follows: The EPA determined that the settlors were responsible for approximately 40% of the volume of waste at the Site, and the remaining defendants were responsible for approximately 60%. The EPA determined that it would cost a total of $7,390,000 to clean up the Site. That amount includes (1) past costs of $2,644,845 incurred by the United States as of April 30, 1993, (2) prejudgment inter-

est on past costs, (3) estimated future oversight costs of $285,000, and (4) an estimated $4,446,000 that the EPA estimated the nonsettling defendants would incur in performing the UAO. (*Cross I,* Memorandum of the United States in Support of Motion for Entry of Proposed Consent Decree, # 351, pp. 8–9.) Thus, the settlement amount of $2,942,343 includes $2,644,845 for past costs, $285,000 for future recovery costs, and an amount for interest. By paying $2,942,232, the settling parties were paying slightly more than the total past and future response costs incurred by the Government.

In its memorandum, the Government stated that it would recover all of its past costs and all estimated future costs through the proposed consent decree. (*Cross I,* # 351, pp. 43–45.) In exchange, the settlors would be protected from liability for contribution to other defendants. The Government stated that the consent decree was fair because the settlors, by paying the Government 100% of its past and future costs, would be in effect paying their share—40%—of total response costs for the Site. (*See Cross I,* # 351, pp. 43–45.) In August 1994, the District Court approved entry of the proposed consent decree (hereinafter "1994 Consent Decree") over the objections of some of the defendants.

During the pendency of *Cross I,* the Government filed two motions for summary judgment that, taken together, sought a determination that the remaining defendants in *Cross I* (including Sherwin–Wiliams, Glidden, Specialty, OXY, and BASF) were liable for all of the Government's past response costs and for all future costs it might incur at the Site.

After entry of the 1994 Consent Decree, Sherwin–Williams filed a motion (*Cross I,* # 400) seeking a finding that the Government's motions for summary judgment

were moot. The District Court granted the motion, stating as follows:

There can be no doubt from the face of the consent decree that it addressed the entire long-term past, present and future clean-up of the Cross site...

...There is no dispute that the [1994] consent decree resulted in the United States recovering an amount slightly greater than their total past response costs *plus* their estimated future costs. This amount included the costs associated with overseeing the remedial action being performed by the nonsettlors under the UAO...

... The Government has received all it asked for in this suit so its claims and motions are now moot.... Passing on whether the nonsettlors would be or were liable for any response costs that have already been paid would be a classic and improper advisory opinion.... Therefore, the Government's two summary judgment motions are denied as moot.

*Cross I*, Order, August 22, 1994, pp. 7–8. Consequently, the District Court dismissed as moot the Government's two summary judgment motions against the remaining defendants in *Cross I*.

**B. United States v. BASF, No. 95–2244**

In September 1995, the Government filed (1) a complaint against BASF and OXY (two of the defendants in the 1989 litigation) for recovery of costs incurred at the Site and for civil penalties for violation of the 1990 clean up order (UAO), and (2) a proposed consent decree (hereinafter "BASF/OXY Consent Decree"). *See United States v. BASF*, No. 95–2244 (C.D.Ill. October 24, 1997) (hereinafter "*Cross II* ").

Sherwin–Williams and Glidden intervened, objecting to the BASF/OXY Consent Decree because they believed the Government could not rightfully seek additional response costs. In addition, Glidden filed a motion to dismiss, asserting that Count I was barred by the affirmative defense of accord and satisfaction. In August 1996, this Court denied that motion, as well as Glidden's motion to dismiss Count I on the alternative basis that the Government was required to exhaust those funds that it had previously obtained through the 1994 Consent Decree before seeking additional funds.

In October 1997, the District Court entered the BASF/OXY Consent Decree over the objections of Sherwin–Williams and Glidden. (*See Cross II*, Minute Entry, October 24, 1997.) As a result, the Government recovered additional response costs from BASF and OXY.

**C. United States of America v. Sherwin–Williams, Glidden, and Specialty, No. 00–2064**

In February 2000, the Government filed the current suit against Defendants. Count II of the complaint seeks to recover in excess of $1 million in allegedly unreimbursed response costs incurred in connection with the Site. The Government contends that a significant portion of those costs stem from litigation precipitated by Defendants over entry of the BASF/OXY Consent Decree. (United States' Opposition to (1) Defendant Sherwin–Williams Company's Motion To Dismiss Certain Claims of Plaintiff's Complaint; (2) The Glidden Company's Motion To Dismiss Count II of the Complaint; and (3) Defendant Specialty Coatings Company, Inc.'s Motion To Dismiss, # 23, p. 9.) Because these costs were not foreseeable at the time of the 1994 Consent Decree or the BASF/OXY Consent Decree, the Government contends it is entitled to seek recovery for them now. *Id.*

All three Defendants in this case filed motions to dismiss Count II, arguing that

the doctrines of judicial estoppel and collateral estoppel bar the claim. The Government argues that collateral estoppel bars the Defendants' motions to dismiss.

## II. Standard

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. *Autry v. Northwest Premium Services, Inc.*, 144 F.3d 1037, 1039 (7th Cir.1998). When considering a motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the claim, and draw all reasonable inferences in the light most favorable to the nonmoving party. *Gutierrez v. Peters*, 111 F.3d 1364, 1368–69 (7th Cir.1997). The Court should dismiss the claim only if the nonmoving party can prove no set of facts consistent with the allegations of the complaint that would entitle him to relief. *Turner/Ozanne v. Hyman/Power*, 111 F.3d 1312, 1319–20 (7th Cir.1997).

On a motion to dismiss, the Court may consider the language of the complaint and "those matters of which the court may take judicial notice." *Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1039 (7th Cir.1987). A federal court can take judicial notice of two types of information: existing law and adjudicative facts pursuant to Rule 201 of the Federal Rules of Evidence.

## III. Analysis

Defendants argue the Court should dismiss Count II of the complaint based on the doctrines of judicial and equitable estoppel. The Government argues that collateral estoppel bars those motions to dismiss.

■ The doctrine of collateral estoppel generally prevents a party from relitigating an issue that the party has already litigated and lost. *Ferrell v. Pierce*, 785 F.2d 1372, 1384 (7th Cir.1986). A party

seeking to invoke collateral estoppel must establish the following four elements: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action. *Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir.1994); *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir.1987).

■ In general, a consent decree does not satisfy the "previously litigated" requirement. The reason for this rule has been explained as follows:

> [A] consent decree ... is not identical in effect to the conclusion reached by a judge after a trial.... [In a consent decree,] [t]he parties' proposal does not reflect the considered judgment of a judicial officer: It has been forged by them alone as an adjustment of conflicting claims and is not a tempered determination of fact and law after the annealment [ (*sic* ) ] of an adversary trial. Depending on the temperament and the calendar of the trial judge, the decree may be subject to serious scrutiny, superficial examination, or perfunctory inspection accompanied by a hosanna because another case is off the calendar.

*Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530, 538 (5th Cir. 1978).

■ Nevertheless, a consent decree *may* be conclusive if the parties clearly have indicated the intent to give a consent decree conclusive effect. *Rest.2d, Judgments*, § 27, comment e; *Klingman*, 831 F.2d at 1296. The Seventh Circuit has stated as follows:

> [I]f the parties to a consent decree "indicated clearly the intention that the de-

cree to be entered shall not only terminate the litigation of claims but, also, determine finally certain issues, then their intention should be effectuated." [*Kaspar Wire Works*, 575 F.2d] at 539; *see also Yachts Am., Inc. v. United States*, 230 Ct.Cl. 26, 673 F.2d 356, 360–62 (1982), *cert. denied*, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4443, at 382 (1981) ("Issue preclusion does not attach unless it is clearly shown that the parties intended that the issue be foreclosed in other litigation."). *Id.* (holding that where parties specifically provided in a consent decree that debts would not be dischargeable in bankruptcy, the bankruptcy court and district court properly applied the principle of collateral estoppel and correctly held that the appellant's debt was not dischargeable). Therefore, when determining the effect to be given a consent decree, the Court considers the parties' intention with respect to the finality to be accorded the decree as reflected in the record and the language of the agreement. *See Kaspar*, 575 F.2d at 539–40.

## A. The Government's Collateral Estoppel Argument

The Government argues that Defendants may not raise the issue of collateral estoppel in this case because they previously raised it (in *Cross II* ) and the Court rejected it. In its response to Defendants' motions to dismiss, the Government stated as follows:

[T]his is no less than the *third* time that defendants have placed the exact same issue before the Court, arguing each time that the United States is somehow barred from seeking response costs incurred in connection with the Cross Brothers Site ("Site") as a result of its prior settlement with *other* parties. Twice before defendants' argument has been rejected by this Court.

(# 23, p. 1.) The Court disagrees that Defendants are collaterally estopped from raising the issue of collateral estoppel *or* that the Court has previously rejected the defense of collateral estoppel.

In *Cross II*, the District Court ultimately approved the BASF/OXY Consent Decree, in which BASF and OXY agreed to pay the Government an amount for response costs. The Government contends that by entering the BASF/OXY Consent Decree, the District Court recognized "by implication" that the Government was not precluded from asserting claims for response costs in addition to those recovered under the 1994 Consent Decree. More importantly, it contends that the District Court's alleged "implicit" refusal to accord preclusive effect to the 1994 Consent Decree in *Cross II* should itself be given preclusive effect in the instant case. The Government is incorrect because the issue it now seeks to preclude was never "actually litigated" in *Cross II*.

As noted above, to fulfill the "previously litigated" element of collateral estoppel, the intent to have litigated the particular issue must be clear. *Klingman*, 831 F.2d at 1296. The Government cannot say that the parties' intent was clear when it admits that the District Court has addressed the issue only by "implication." Here, the record does not show that the parties clearly intended to have litigated the issue of whether the Government is collaterally estopped from seeking additional response costs.

Moreover, collateral estoppel is not generally applied "if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Kairys v. INS*, 981 F.2d 937, 939 (7th

Cir.1992), quoting *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 979 n. 11, 59 L.Ed.2d 210 (1979). When a trial court's focus is on settling the litigation rather than adjudicating it on the merits, ample reason exists to doubt the extensiveness and fairness of the procedures followed.

The record in *Cross II* indicates that the District Court was focused on settlement. The consent decree was filed the same day as the complaint; therefore, Judge Harold Baker was aware from the beginning of the case that no dispute existed between the original parties to the suit (BASF, OXY, and the Government). Only the intervenors, Sherwin–Williams and Glidden, opposed entry of the decree. In addition, Judge Baker made the following comment to attorneys at a hearing on pending motions:

> What I should do is set a deadline for filing the motion to enter the consent decree, and you should be able to get that done by somewhere in January. And once we get that on board, then we can set a briefing schedule and so forth and hopefully get rid of this thing in March or April...

(*Cross II*, Hearing on Pending Motions, November 19, 1996, pp. 47–48.) The following colloquy occurred between Judge Baker and Jerome Bowman, Sherwin–Williams' attorney, during another hearing held regarding the proposed consent decree:

> THE COURT: How can that be a valid point for you, an intervenor, to say that the Government and BASF and Oxy don't have any disputes so you can't settle?
>
> Mr. Bowman: Well -
>
> THE COURT: What do you care if they settle a nondispute?

(*Cross II*, Transcript of April 10, 1997, Hearing, p. 21.) These comments demonstrate the District Court's focus on achieving settlement. Because the District Court focused on settling the case, rather than on a judicial determination of the merits of the issues raised by Sherwin–Williams and Glidden, the Court concludes that the government has failed to satisfy the "previously litigated" element required for collateral estoppel.

As further evidence that the issue of collateral estoppel was not previously litigated, this Court's Report and Recommendation (*Cross II*, # 36) recommended denying Glidden's motion to dismiss the Government's complaint against BASF and Oxy on the bases of (1) accord and satisfaction, and (2) failure to exhaust the settlement proceeds it received in connection with the 1994 Consent Decree. In the Report and Recommendation, Magistrate Judge Bernthal *expressly* left open the possibility that the Government's complaint might be barred by "some other applicable affirmative defense, such as collateral estoppel." (*Cross II*, # 36, pp. 10–11.) The District Court accepted the Report and Recommendation without comment. (*See Cross II*, August 6, 1996, Minute Entry.)

Accordingly, based on the record in *Cross II*, Defendants are not collaterally estopped from raising the doctrine of collateral estoppel in the instant case.

### B. Defendants' Collateral Estoppel Argument

Defendants argue that the doctrine of collateral estoppel bars the Government from seeking additional response costs for the Cross Site. Specifically, they contend that all of the Government's claims for past and future response costs in connection with the Site were satisfied as a matter of law when the District Court entered the 1994 Consent Decree in *Cross I*. Furthermore, the District Court held that, in

light of the 1994 Consent Decree, the Government's claim against the nonsettling defendants for response costs was moot. Accordingly, the District Court dismissed with prejudice the Government's complaint against the defendants in that suit, including BASF, OXY, Glidden, Sherwin–Williams, and Specialty.

An examination of the record supports Defendants' collateral estoppel argument. In particular, the following documents show that the Government is collaterally estopped from seeking additional response costs for the Site: the 1994 Consent Decree, the Memorandum of the United States in Support of Motion for Entry of Proposed Consent Decree (*Cross I*, # 351), the District Court's order granting the Government's motion for entry of the 1994 Consent Decree (*Cross I*, Order, April 28, 1994), and the District Court's order addressing the Government's summary judgment motions and Sherwin–Williams' motion seeking a finding that the Government's summary judgment motions were moot (*Cross I*, Order, August 22, 1994).

The 1994 Consent Decree stated that "[t]he matters addressed in this settlement shall include *all* costs incurred or to be incurred by the United states or any other person for CERCLA response actions relating to the Site..." (1994 Consent Decree, p. 20 (emphasis added).) When the Government entered into the 1994 Consent Decree with the third-party defendants, it represented to the District Court that its claims for all past and future response costs would be satisfied by its recovery under that consent decree, stating as follows:

> This amount [recovered under the 1994 Consent Decree] covers all of the United States' past response costs at the Cross Brothers Pail (Pembroke) Site, Pembroke Township, Kankakee County, Illi-

nois, and the estimated future costs of the United States to oversee future performance of the remedy for the site. Entry of the decree will resolve all of the United States' claims for past and future costs alleged in the Complaint in this action.

*Cross I*, # 351, p. 2.

In seeking the District Court's approval for the 1994 Consent Decree, the Government contended that the Consent Decree was fair because the settlors, by paying the Government 100% of its past and future costs, would be paying 40% of total response costs, which the EPA had estimated constituted their share of total response costs. In exchange, they would be protected from nonsettlors' claims for contribution liability. Moreover, the Government indicated that, even though Sherwin–Williams, Glidden, and Specialty lost their right to seek contribution from the third-party defendants as a result of the 1994 Consent Decree, they (and other nonsettling defendants in *Cross I*) would be released from liability for the Government's past and future response costs. (*Cross I*, # 351, pp. 43–48.)

The District Court apparently relied on the Government's representations regarding its past and future costs in finding the proposed settlement fair. In its Order granting entry of the 1994 Consent Decree, it acknowledged the Government's intent that the 1994 Consent Decree would resolve the issue of its past and future costs at the Site, stating as follows:

> The Consent Decree provides that the settling parties ... pay the United States $2,942,232. This amount ... *will cover all* of the Government's past and future costs at the Site for clean-up and supervision [footnote excluded] and resolve all of its claims [footnote excluded].

*Cross I*, Order, April 28, 1994, p. 4 (emphasis added).

In addition, the District Court later ruled on a motion (*Cross I, #* 400) by Sherwin–Williams' for a finding that the Government's motions for summary judgment (seeking a declaration that Sherwin–Williams, Glidden, and Specialty were liable for additional response costs) and claims against it were moot. In granting Sherwin–William's motion, the District Court stated as follows:

> . . .There is no dispute that the [1994] consent decree resulted in the United States recovering an amount slightly greater than their total past response costs *plus* their estimated future costs. This amount included the costs associated with overseeing the remedial action being performed by the nonsettlors under the UAO. . .
>
> . . . The Government has received all it asked for in this suit so its claims and motions are now moot. . . . Passing on whether the non-settlors would be or were liable for any response costs that have already been paid would be a classic and improper advisory opinion. . . . Therefore, the Government's two summary judgment motions are denied as moot.

(*Cross I,* Order, August 22, 1994, pp. 7–8.) Consequently, the District Court dismissed as moot the Government's summary judgment motions against the nonsettling parties (including Sherwin–Williams, Glidden, and Specialty) that sought a declaration of their liability for additional response costs at the Site.

To invoke collateral estoppel, Defendants must establish the following four elements: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must

have been fully represented in the prior action. *Meyer v. Rigdon,* 36 F.3d 1375, 1379 (7th Cir.1994); *Klingman,* 831 F.2d at 1295.

### 1. The Issue Sought To Be Precluded Must Be the Same as in the Prior Action

In the instant case, Count II of the complaint seeks response costs pursuant to Section 107 of CERCLA (42 U.S.C. § 9607) for costs the Government has incurred and continues to incur at the Site. (Complaint, # 1, pp. 7–9.) Defendants contend that collateral estoppel precludes this issue.

The record shows that the same issue—the Government's claim for response costs—was at issue in *Cross I.* For example, in its memorandum supporting entry of the 1994 Consent Decree, the Government stated that the 1994 Consent Decree resolved all of its claims for past and future costs, as follows:

> [The] proposed Consent Decree . . . resolves claims by the United States for recovery of costs brought pursuant to Section 107 of the [CERCLA], 42 U.S.C. § 9607. The proposed Consent Decree provides for the payment to the United States by the settling parties of $2,942,232. This amount covers all of the United States' past response costs at the [Site], and the estimated future costs of the United States to oversee future performance of the remedy for the site. Entry of the decree will resolve all of the United States' claims for past and future costs alleged in the Complaint in this action.

*Cross I,* # 351, pp. 1–2.

In its order granting entry of the 1994 Consent Decree, the District Court also observed that the Government's past and future response costs were at issue, as follows:

The Consent Decree provides that the settling parties ... pay the United States $2,942,232. This amount ... will cover all of the Government's past and future costs at the Site for clean-up and supervision [footnote excluded] and resolve all of its claims.

*Cross I*, Order, April 28, 1994, p. 4.

Thus, the Government's own words in *Cross I* show that its claim for past and future response costs at the Site was an issue in *Cross I* as well as the instant case.

### 2. The Issue Must Have Been Actually Litigated

During the pendency of *Cross I*, the Government filed a Motion for Order for Entry of Proposed Consent Decree (*Cross I*, # 350), and a memorandum in support of that motion (*Cross I*, # 351). Sherwin–Williams and Specialty filed objections to entry of the 1994 Consent Decree (*Cross I*, # 372, # 373) because it would activate CERCLA's contribution protection (42 U.S.C. § 9613(f)(2)), thus immunizing the settling parties from future claims by the nonsettling parties. The parties had opportunities to present their respective positions during several hearings. Thus, the issue of payment of past and future response costs was important to the question of the fairness of the 1994 Consent Decree and it was vigorously litigated during *Cross I*.

■ A consent decree cannot fulfill the "actually litigated" requirement of collateral estoppel if there is reason to doubt the extensiveness or fairness of procedures following in prior litigation. (*See Kairys*, 981 F.2d at 939.) Nevertheless, when collateral estoppel depends in part on a consent decree, the "actually litigated" element is satisfied where the parties have clearly indicated their intention that the consent decree resolve the issue. (*See Klingman*, 831 F.2d at 1296.) In *Cross I*, the record

is clear that the parties intended the 1994 Consent Decree to resolve the issue of the Government's past and future response costs.

The 1994 Consent Decree itself stated that "[t]he matters addressed in this settlement shall include *all* costs incurred or to be incurred by the United states or any other person for CERCLA response actions relating to the Site..." (1994 Consent Decree, p. 20 (emphasis added).)

The District Court acknowledged the Government's intent that the 1994 Consent Decree would resolve the issue of its past and future costs at the Site. In its order granting entry of the 1994 Consent Decree, the District Court stated as follows:

The Consent Decree provides that the settling parties ... pay the United States $2,942,232. This amount ... *will cover all* of the Government's past and future costs at the Site for clean-up and supervision [footnote excluded] and resolve all of its claims [footnote excluded].

*Cross I*, Order, April 28, 1994, p. 4 (emphasis added). Thus, the parties' intent in this case was clear. According to the standard delineated in *Klingman*, the issue was actually litigated.

■ Moreover, the District Court granted Sherwin–Williams' motion (*Cross I*, # 400) for a finding that the Government's motions for summary judgment (seeking declarations that Sherwin–Williams, Glidden, and Specialty were liable for past and future response costs) were moot. The District Court stated as follows:

...There is no dispute that the [1994] consent decree resulted in the United States recovering an amount slightly greater than their total past response costs *plus* their estimated future costs. This amount included the costs associated with overseeing the remedial action

being performed by the nonsettlors under the UAO...

... The Government has received all it asked for in this suit so its claims and motions are now moot.... Passing on whether the non-settlors would be or were liable for any response costs that have already been paid would be a classic and improper advisory opinion.... Therefore, the Government's two summary judgment motions are denied as moot.

*Cross I,* Order, August 22, 1994, pp. 7–8. The District Court then dismissed as moot the Government's two summary judgment motions against the remaining defendants in *Cross I* (including Sherwin–Williams, Glidden, and Specialty) that sought a declaration of their liability for past and future response costs at the Site. Although disposition of a motion on the basis of mootness does not constitute a ruling on the merits of the issue, the District Court's order does show that the parties intended the Consent Decree to resolve all past and future response costs. Nevertheless, in granting Sherwin–Williams' motion (*Cross I,* # 400), the District Court ruled on the merits of the issue and provided further evidence of the intent of the parties, as well as evidence that the issue has been actually litigated.

### 3. The Determination of the Issue Must Have Been Essential to the Final Judgment

In its memorandum supporting entry of the 1994 Consent Decree, the Government stated that the settlement provided for the Government to receive a fair amount from the third-party settlors that fully resolved all of the Government's claims for past and future response costs at the Site. (# 351, pp. 2, 45–48.) (The additional costs of remediation were to be borne directly by the nonsettlors as they carried out the UAO.) After the District Court entered the

1994 Consent Decree, it dismissed the Government's remaining claims against the nonsettling parties for mootness and dismissed the Government as a party. Thus, the Government's statement that the 1994 Consent Decree resolved all of the Government's claims for past and future costs was clearly essential to the final disposition of *Cross I.*

### 4. The Party Against Whom Estoppel Is Invoked Must Have Been Fully Represented in the Prior Action

The Government was a party to *Cross I,* thus, it was fully represented in the prior action. It vigorously defended the fairness of the Consent Decree over the objections of Sherwin–Williams, Glidden, and Specialty.

■ Based on the record, all four elements of the doctrine of collateral estoppel have been satisfied. Furthermore, the documents clearly show the parties' intent that the 1994 Consent Decree would resolve all the Government's claims for past and future response costs and the District Court's acknowledgment of that intent. Accordingly, the Court recommends granting Defendants' motion to dismiss Count II on the basis of collateral estoppel.

### B. Judicial Estoppel

Defendants also argue that the doctrine of judicial estoppel bars the Government from seeking additional response costs. This doctrine provides an alternate basis for granting Defendants' motions to dismiss Count II.

■ The doctrine of judicial estoppel prevents a party who prevails on one ground in a lawsuit from changing positions and repudiating that ground in another lawsuit. *McNamara v. City of Chicago,* 138 F.3d 1219, 1225 (7th Cir.), *cert. denied,* 525 U.S. 981, 119 S.Ct. 444, 142

L.Ed.2d 398 (1998). It is intended "to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992).

The Government contends that Defendants may not raise the equitable defense of judicial estoppel against the Government. It bases this contention on several cases, including *Immigration & Naturalization Serv. v. Miranda,* 459 U.S. 14, 103 S.Ct. 281, 282–283, 74 L.Ed.2d 12 (1982); *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 66 S.Ct. 101, 105, 90 L.Ed. 47 (1945); *United States v. Marine Shale Processors,* 81 F.3d 1329, 1348–49 (5th Cir. 1996); and *United States v. Vineland Chem. Co.,* 692 F.Supp. 415, 423 (D.N.J. 1988). The Court notes that these cases involve equitable estoppel, not collateral estoppel or judicial estoppel. Here, Defendants are not asserting *equitable* estoppel against the Government; rather, they contend that judicial estoppel and collateral estoppel bar the Government's claims.

In its brief, the Government acknowledges that the case law it cites discussing estoppel against the United States addresses the doctrine of equitable estoppel. (# 23, p. 27 n.27.) Nevertheless, the Government states that "the same principles that severely limit the application of equitable estoppel against the United States are also implicated with respect to judicial estoppel. *See e.g., United States v. Owens,* 54 F.3d 271, 275 (6th Cir.), *cert. dismissed sub nom. Spirko v. United States,* 516 U.S. 983, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995)." In *Owens,* a Sixth Circuit case, the court stated that "the rule of judicial estoppel, even when invoked, should be construed narrowly against the government for the policy reasons stated in *Heckler [v. Community Health Services]*, 467 U.S. 51 [104 S.Ct. 2218], 81 L.Ed.2d 42 (1984) (discussing equitable estoppel)." In contrast, in two cases seeking to invoke judicial estoppel against the federal government, the Seventh Circuit gave no indication that a different standard should apply when a government body is involved. *See Levinson,* 969 F.2d at 265–65 (denying the application of judicial estoppel on other grounds); *Eagle Foundation, Inc. v. Dole,* 813 F.2d 798, 810 (7th Cir.1987) (denying the application of judicial estoppel on other grounds).

Judicial estoppel, unlike equitable estoppel, is a "knowing assault upon the integrity of the judicial system." *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 474 (6th Cir.1988). Based on Seventh Circuit case law on the doctrine of judicial estoppel, this Court concludes that government entities are not necessarily treated differently when applying judicial estoppel or collateral estoppel to preclude a government entity from disputing determinations made against it in prior litigation. *See Czajkowski v. City of Chicago,* 810 F.Supp. 1428, 1444–45 (N.D.Ill.1992) (holding that the City of Chicago was judicially estopped from denying a position on which it had prevailed during the course of a Police Board proceeding).

Accordingly, the Court recommends rejecting the Government's argument that Defendants may not assert the defense of judicial estoppel in this case. *See Czajkowski,* 810 F.Supp. at 1444–45 (judicial estoppel may be asserted against any party, including the government).

To succeed on Count II of its complaint in the current case, the Government must necessarily take a position at odds with the position it took in moving for entry of the 1994 Consent Decree. In Count II of the complaint, the Government seeks a finding that "[e]ach defendant is jointly and severally liable to the United States for all response costs incurred and to be incurred by the United States in connection with

the Site[.]" (Complaint, #1, ¶31.) Similarly, in its complaint in *Cross I*, the Government sought a judgment that the same defendants were liable "for all response costs incurred by the United States in connection with the facility," and a declaratory judgment "for future response costs incurred by the United States in connection with the facility." (*Cross I*, Complaint, Prayer for Relief, ¶¶ 1–2.)

Because the Government seeks the same relief in the present case as it did in *Cross I*, it must argue that it did not actually recover or seek to recover all of its costs in the 1994 Consent Decree. However, in its motion for entry of the 1994 Consent Decree, the Government made it clear that the decree covered all of its response costs. (*See Cross I,* # 350, pp. 19, 43, 45.) Furthermore, in its Order approving entry of the 1994 Consent Decree, the District Court acknowledged that the settlement amount of $2,942,232 "will cover all of the Government's past and future costs at the Site for clean-up and supervision [ (footnote omitted) ] and resolve all of its claims." (*See Cross I,* Order, April 28, 1994, p. 4.) Finally, the District Court denied the Government's motions for summary judgement as moot because those motions sought recovery of response costs that the Government had already recovered. (*See Cross I,* Order, August 22, 1994, pp. 7–8.)

Judicial estoppel has three elements, including the following: (1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same; and (3) the party to be estopped must have convinced the first court to adopt its position. *Levinson,* 969 F.2d at 264. Moreover, the estopped party may have prevailed on the issue through a settlement agreement. *Kale v. Obuchowski,* 985 F.2d 360, 362 (7th Cir. 1993). Our review of the evidence shows that all three elements are present here.

Accordingly, the Court concludes that the doctrine of judicial estoppel provides an alternate basis for granting Defendants' motions to dismiss Count II.

The Government also argues that it expressly retained its right to seek additional future costs by using the term "estimate" when referring to future costs. The Court finds this argument highly unpersuasive. Future costs, by their very nature, must be estimated. In any settlement, parties who include future costs are taking a risk that actual costs may vary from the estimate. Moreover, the 1994 Consent Decree defined "future response costs" as "*all* costs, including but not limited to direct and indirect costs, that EPA and the United States Department of Justice on behalf of EPA will incur for response actions at the Site after the date of entry of this decree." (1994 Consent Decree, p. 7 (emphasis added).) The 1994 Consent Decree stated that it covered "*all* costs incurred or to be incurred by the United States or any other person for CERCLA response actions relating to the Site[.]" (1994 Consent Decree, p. 20 (emphasis added).) Thus, the Government cannot now seek additional response costs.

### IV. Summary

For the reasons set forth above, this Court recommends that Defendants' motions to dismiss (# 14, # 15, # 19) be **GRANTED** with prejudice. The parties are advised that any objection to this recommendation must be filed in writing with the clerk within ten (10) working days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986).